IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No. 04-cv-01122-LTB-MJW

DEBORA K. RUDD,

Plaintiff,

v.

BURLINGTON COAT FACTORY WAREHOUSE OF COLORADO, INC., a Colorado corporation, and MICHAEL NEUMAN, individually and in his capacity as supervisor,

Defendants.

_____

ORDER
_____

The defendants, Burlington Coat Factory Warehouse of Colorado, Inc. ("BCF") and Michael Neuman, move for summary judgment on the claims of the plaintiff, Debora K. Rudd, for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, contractual interference, and interference with prospective business relations. The motion is adequately briefed and oral argument would not materially aid its resolution. For the reasons stated below, I DENY the motion in part and GRANT it in part.

**I. Facts**

The following facts are undisputed except where otherwise noted.

Mr. Neuman is BCF's district manager, overseeing stores in Colorado and nearby states. Among his stores is one in Westminster, Colorado, at which Ms. Rudd was employed. BCF employed Ms. Rudd at will from 1990 until June 27, 2003. During that time, Ms. Rudd served in a number of roles, including as Mr. Neuman's personal secretary. Throughout her time at BCF,

Ms. Rudd performed satisfactorily. Though she was once, while serving in a supervisory role, placed on a 60-day probation while she oversaw the improvement of underlings, she was subjected to no other disciplinary actions before the events giving rise to this lawsuit. She did, however, earn some adversaries by reporting what she perceived to be co-workers' violations of company rules. Angela Bochy, operations manager of the Westminster store, confided to at least one co-worker the depth of her animosity toward Ms. Rudd. Around the same time, an investigation into whether Ms. Rudd was abusing her employee discount to obtain merchandise in contravention of BCF policy ended in her vindication.

In March, 2002, after failing to obtain from Mr. Neuman a pay raise she had pursued, Ms. Rudd asked for and was granted a transfer to the receiving department of the Westminster store, where she worked until her termination. She telephoned Mr. Neuman to tell him of her transfer, which she planned to accomplish immediately and without warning. Though Ms. Rudd's sudden departure caused Mr. Neuman inconvenience, he did not hold her action against her. Ms. Rudd's daughter, Jesica, also worked in receiving during that time. Tammy Skurnick, then the manager of the Westminster store, asked Ms. Rudd to serve as manager of the receiving department. Ms. Rudd declined; family members are prohibited in BCF policy from supervising each other. Ms. Rudd nevertheless proved an asset to the department, which produced a marked increase in performance.

The BCF Employee Handbook, which Ms. Rudd received, states, *inter alia*,

Time-Keeping

Accurately recording time worked is the responsibility of every employee. Federal and state laws require BCF to keep an accurate record of time worked in order to calculate your pay and benefits. Time worked is the time you actually spend engaged in a work-

>related activity.
>
>You must accurately record the time you begin and end work, as well as the beginning and ending time of each rest break and meal period. You must also record the beginning and ending time of any split shift or departure from work for personal reasons. Overtime work must be approved by a manager before it is performed.
>
>Your pay is computed on the basis of the entries on the attendance report or time card, approved and verified by your store manager, which reflects the times you clocked in or out using your BCF swipe card at the time clock. For this reason, the process of clocking in and out must be strictly followed. *Under no circumstances may you alter, falsify, tamper with time records or record time on another employee's time record. It is equally forbidden for you to ask another employee to clock you in or out or for you to perform this service for another employee.* Failure to fully comply with this requirement may result in disciplinary action, up to and including termination of employment for even a first offense.
>
>Any error should be brought to the immediate attention of store management.
>
>No secondary measures for keeping time, other than utilizing the BCF swipe card or the Employee Edit Release Form (see next section), may be used for recording employee hours.

(Emphasis original.) The next section requires employees to correct any errors to the time sheet on a daily basis. The Handbook elsewhere provides that employees may daily take a half-hour unpaid meal period and two paid 15-minute rest breaks.

Deponents offered varying understandings of the purpose for the time-keeping rule. Mr. Neuman sees the issue as one of preventing wage theft. Chris Limppo, who at the time of the events giving rise to this lawsuit was the loss-prevention manager at the Westminster store, believes that the rule was designed to prevent the store from bearing risks to which employees might be exposed when not in the store. Ms. Skurnick testified that the reason for enforcing the rule is to make management aware of employees' whereabouts.

The timekeeping policy was enforced inconsistently. Mr. Limppo testified that, in

practice, employees who had permission to leave the building were not required to clock out or in. Ms. Skurnick testified that, though employees were required to clock out every time they left the building for purposes other than company business, she did not enforce the rule until later in her management tenure. She recalled citing two employees – Mr. Limppo and Chris Moore, the manager of the receiving department – for failures to clock out. She explained in deposition that managers typically did not investigate whether employees were clocking out and in for breaks unless it was brought to their attention that an employee was taking an unusually large number of leaves from the building. Mr. Neuman could not recall any employees, other than Ms. Rudd, as set forth below, having been disciplined for failure to clock out when leaving the building with permission from a manager.

Ms. Skurnick knew of several occasions throughout 2002 and 2003 on which Ms. Rudd had failed to clock out or in for which Ms. Skurnick took no disciplinary action. Eventually, Ms. Skurnick conversed with Ms. Rudd about the issue and reminded her of her obligation to obey the rule for the sake of fairness: other employees were taking their allotted breaks while Ms. Rudd was taking extra breaks. Ms. Rudd complained to the corporate office, which decreed that employees could take breaks in addition to their allotted two but must clock out for each. Ms. Rudd continued to violate the rule after the issuance of the corporate edict, as did other employees. None were disciplined at that time.

Ms. Rudd's evasion of Mr. Neuman's oversight was finite. When, in April, 2003, Ms. Skurnick left BCF, Mr. Neuman assumed direct supervision of the Westminster store. Enforcement of the timekeeping rule commenced. On May 8, 2003, Ms. Bochy asked Mr. Limppo to investigate whether Ms. Rudd had that day taken a lunch break without clocking out.

Mr. Limppo determined that Ms. Rudd had taken a break and had been on the clock at the time. However, BCF did not subject Ms. Rudd to disciplinary action. Ranee Grayson, a co-worker, was later issued a written warning for not clocking out during that time. Another employee, Angel Garcia, neglected to clock out but was neither investigated nor disciplined.

Additional infractions ensued. Mr. Limppo uncovered evidence that Ms. Rudd failed to clock out for breaks on May 12, May 13, May 14, and May 19, 2003. Ms. Rudd, however, was not disciplined for these infractions because Mr. Neuman determined that the evidence was insufficiently conclusive.

On May 16, 2003, several employees from the receiving department, including Ms. Rudd, met for a potluck lunch without clocking out. At Mr. Neuman's request, Mr. Limppo conducted an investigation and issued written warnings to Ms. Rudd, Jesica Rudd, and four other receiving employees. Mr. Limppo testified that Mr. Neuman's request for this investigation was "out of the ordinary" but not unprecedented. Thereafter, also at Mr. Neuman's request, Mr. Limppo maintained a daily log of each of the infractors' breaks.

On June 10, 2003, Mr. Neuman summoned Jesica Rudd to his office. Ms. Rudd and Ms. Romero also attended. Mr. Neuman informed Jesica that, as a result of budget constraints, he intended to transfer her out of receiving and into the linens department. Jesica and Ms. Rudd expressed several objections to that proposal, among which that Mr. Limppo would soon also be transferring to the linens department. They explained that Mr. Limppo and two other male employees had made sexually-explicit comments about Jesica. Mr. Neuman promised an investigation into Jesica's harassment allegations and asked her for a written statement. She did not provide one that day.

On June 13, 2003, Ms. Rudd asked of Raquel Romero, the merchandising manager, and was granted permission to go out to her car to retrieve Jesica's written statement. Mr. Limppo saw Ms. Rudd leave the building at 9:41 A.M. and return at 9:55 A.M.. Ms. Rudd did not clock out or in at those times. In the interim, she placed two telephone calls on her cell phone – she called Jesica and an attorney – and retrieved from the car a handwritten note, given to Jesica, on which a male BCF employee had inscribed the words, "I love you." She gave the note to Ms. Romero but did not produce a written statement. Ms. Rudd that day took cigarette breaks, for which she clocked out and in, between 9:16 and 9:26 A.M., 10:46 and 10:56 A.M., and 12:12 and 12:21 P.M.. She did not correct her time card that day or later. On June 27, 2003, after investigation by Messrs. Neuman and Limppo, BCF terminated Ms. Rudd's employment for June 13 violation of the timekeeping policy.

## II. Discussion

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). I shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 5(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file

together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Id.* at 323; *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992).

Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); Fed. R. Civ. P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex* at 324.

**A.  Retaliation claim**

Ms. Rudd under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) bears the initial burden of proving by indirect evidence a *prima facie* case of retaliation under Title VII. *Kelley v. Goodyear Tire and Rubber Co.*, 220 F.3d 1174, 1179 (10th Cir. 2000). In order to establish her claim, she must prove that (1) she engaged in a protected opposition to discrimination or participated in a proceeding arising out of the discrimination, (2) BCF took an adverse action against her after the protected activity, and (3) a causal connection exists between her activity and the adverse action. *Griffith v. State of Colo., Div. of Youth Services*, 17 F.3d 1323, 1331 (10th Cir. 1994). If she establishes a *prima facie* case, then BCF must articulate, and support with some evidence, a legitimate, nondiscriminatory reason for the discharge. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 (10th Cir. 1997). If BCF meets this burden, Ms. Rudd must then present evidence raising a genuine issue that the reason offered by BCF is a mere pretext. *Id.*

BCF challenges Ms. Rudd's *prima facie* case at the causation element; it does not, for the

purposes of this motion, deny that she engaged in protected activity or that it took an adverse action against her. She intends to prove causation by temporal proximity; BCF fired her seventeen days after she participated in her daughter's oral complaint of sexual harassment. Though temporal proximity alone is usually insufficient to establish causation, "a causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001). Here, the inference of retaliatory motive is subject to some doubt – BCF first issued a written warning to Ms. Rudd and began investigating her for further infractions weeks before she participated in her daughter's claim – but possible.

The record yields two contradictory inferences. A fact finder might find significant that BCF began enforcing the timekeeping rule against Ms. Rudd before she participated in her daughter's harassment claim or might focus on the fact that Ms. Rudd alone was discharged for violation of the rule. On the one hand, Ms. Rudd had an established history of violating the rule before June, 2003. On the other hand, BCF fired Ms. Rudd for a *de minimis* infraction little more than two weeks after she engaged in concededly-protected activity. I am required to construe the evidence in the light most favorable to Ms. Rudd and so find and conclude that she has established a *prima facie* case for purposes of defeating summary judgment. *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (one and one-half month delay sufficient to establish causation), *overruled on other grounds by Ellis v. University of Kansas Medical Center*, 163 F.3d 1186, 1194-1197 (10th Cir. 1998).

Ms. Rudd also has met her burden of proffering evidence sufficient to raise a factual question whether BCF's stated nondiscriminatory reason for dismissing her – her violation of the

timekeeping rule – was pretextual. She is required to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in BCF's proffered reasons such that "a reasonable factfinder could rationally find them unworthy of credence." *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1136 (10th Cir. 2005). This she has done.

Though the parties do not dispute that Ms. Rudd's employment was at will, and Ms. Rudd does not suggest that BCF was obliged to protect her from the vicissitudes of corporate life, the record demonstrates that the timekeeping rule was not uniformly enforced in the Westminster store. Ms. Rudd does not deny that she failed to clock out both on May 16, 2003 and on June 13, 2003. Nor does any evidence suggest that Ms. Rudd took the requisite steps to correct her time card after the fact. Nevertheless, a material factual question exists whether, as Mr. Limppo and Ms. Skurnick have suggested, management consent might properly have excused Ms. Rudd's technical violation of the rule. The text of BCF's policy and its application in practice diverged. It remains for a jury to decide whether that divergence served Ms. Rudd's retaliatory dismissal.

**B.    Interference claims**

Ms. Rudd has asserted claims against Mr. Neuman for interference in her relationships with prospective employers and for interference in her contractual relationship with BCF. She has, by her motion, voluntarily dismissed the former.

An agent who, while acting within the scope of official duties, causes his or her principal to breach a contract generally will not be held liable for tortious interference with that contract. *W.O. Brisben Companies, Inc. v. Krystkowiak*, 66 P.3d 133, 136 (Colo. App. 2002), *aff'd*, 90 P.3d 859 (Colo. 2004). An agent may be liable only if he acts not at all in service to the corporation's interests but instead is motivated solely out of animus toward one or both

9

contracting parties. *Id.*

Ms. Rudd grounds her contractual interference claim on her and Mr. Limppo's speculation in their respective depositions that Mr. Neuman was looking for a reason to fire her. That speculation does not rise to the level of evidence. Even if Ms. Rudd could offer evidence of animus, which she has not done, she must prove that Mr. Neuman acted with the sole motive to harass or retaliate against her. *Trimble v. City and County of Denver*, 697 P.2d 716, 726 (Colo. 1985); *W.O. Brisben Companies*, 66 P.3d at 137. She has not controverted Mr. Neuman's testimony that he was motivated at least in part by his desire to prevent time fraud.

Accordingly, it is ORDERED that

1) the defendants' motion for summary judgment is GRANTED in part and DENIED in part; and

2) Ms. Rudd's claims for contractual interference and interference with prospective business relationships are DISMISSED.

Dated: September   20  , 2005, in Denver, Colorado.

                                                            BY THE COURT:

                                                         s/Lewis T. Babcock
                                                        Lewis T. Babcock, Chief Judge